IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>vs.<br><br>**KEVIN DION HOLLINSHEAD** | CR. NO.: 2:26-174<br><br>18 U.S.C. § 2<br>18 U.S.C. § 666<br>18 U.S.C. § 1343<br>18 U.S.C. § 1344<br>18 U.S.C. § 1346<br>18 U.S.C. § 981(a)(1)(C)<br>18 U.S.C. § 982(a)(2)<br>18 U.S.C. § 982(a)(3)<br>28 U.S.C. § 2461(c)<br><br>**INDICTMENT**<br>**(UNDER SEAL)** |

**THE GRAND JURY CHARGES:**

At all times relevant to this Indictment:

**Background of Bribery Scheme as Charged in Counts 1 and 2**

1.      The Defendant, **KEVIN DION HOLLINSHEAD**, is a resident of North Charleston, South Carolina.

2.      The Charleston County School District ("CCSD" or "District") is the second-largest school system in South Carolina. CCSD operates 88 schools and serves approximately 50,000 students.

3.      The CCSD Board of Trustees consists of nine elected members representing specific constituent districts within Charleston County. The members are elected in nonpartisan elections and serve four-year staggered terms.

4. The CCSD Board of Trustees oversees the governance of public education in the District. They are responsible for approving policies and budgets, overseeing facilities, and ensuring that the District's operations align with the needs of students, families, and the community. The Board also serves as a bridge between the community and school administrators, representing both student needs and community concerns.

5. The CCSD Board of Trustees is responsible for numerous aspects of district operations, including but not limited to:

   a. Hiring, evaluating, and overseeing the Superintendent of Schools;

   b. Approving the allocation and expenditure of district funds, including revenues from federal sources;

   c. Employing or dismissing certified and classified personnel;

   d. Establishing salaries and approving contracts for certified personnel;

   e. Structuring district policies and ensuring their implementation; and

   f. Establishing and maintaining high instructional standards aligned with state requirements.

6. The CCSD Superintendent manages the day-to-day operations of CCSD and reports to the Board of Trustees.

7. In Fiscal Year 2025, CCSD received approximately $87,000,000 in revenues from federal sources. Therefore, CCSD is an agency that receives, in any one-year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of federal assistance.

8.     In November 2024, **KEVIN DION HOLLINSHEAD** was elected to CCSD's Board of Trustees as the Trustee representing County Board District 4. **KEVIN DION HOLLINSHEAD's** term as Trustee expires in November 2028.

9.     County Board District 4 encompasses portions of the City of Charleston and the City of North Charleston.

10.    Construction Company, known to the Grand Jury, is a commercial construction and development company. Contractor, known to the Grand Jury, serves as a Senior Vice President of Construction Company's Charleston location.

### Construction Company's Failed Bid for School Project

11.    Construction Company has constructed schools within CCSD. In or about 2024, Construction Company submitted a bid to construct the new middle school in District 10. However, CCSD did not select Construction Company's bid because it did not comply with CCSD's procurement requirements. Specifically, one of the proposed subcontractors did not possess an active license in South Carolina.

12.    Contractor and **KEVIN DION HOLLINSHEAD** have a preexisting relationship. Contractor has supported **KEVIN DION HOLLINSHEAD's** campaigns. When Construction Company lost the bid for the middle school, Contractor contacted **KEVIN DION HOLLINSHEAD** for assistance.

13.    Contractor submitted a bid protest arguing that, as the low-cost bidder on the middle school project, it should have been awarded the bid over the contractor that was ultimately selected by CCSD. Upon receipt of a bid protest, CCSD must empanel a Procurement Review Panel to evaluate the protest.

14.     CCSD's policy states that the "[Procurement Review] Panel must be composed of a member of the Board appointed by the Board, who will chair the Panel. In addition, four persons shall be appointed, one each, by the Chair of the Board, the Vice-Chair of the Board, the Superintendent, and the chief business official. These persons shall recuse themselves in any matter in which they have an actual or apparent conflict of interest." (S.C. Code Ann. § 11-25-4410).

### *Hollinshead Introduces Source 1 to Contractor*

15.     In or about April 2025, **KEVIN DION HOLLINSHEAD** contacted Source 1, known to the Grand Jury. **KEVIN DION HOLLINSHEAD** wanted Source 1 to act as a "consultant" for Construction Company and Contractor in a protest of CCSD's rejection of their bid to construct the middle school in District 10.

16.     In or about April 2025, the Federal Bureau of Investigation ("FBI") made contact with Source 1. Source 1 told the FBI that **KEVIN DION HOLLINSHEAD** indicated that he wanted Contractor to engage Source 1 for assistance with the bid protest. Source 1 expected **KEVIN DION HOLLINSHEAD** to solicit a portion of whatever funds Source 1 received from Construction Company. **KEVIN DION HOLLINSHEAD** further told Source 1 that he could not work directly on behalf of Construction Company or tender a vote on the issue because Contractor had previously contributed to **KEVIN DION HOLLINSHEAD's** campaigns for CCSD's Board of Trustees elections.

17.     On or about April 16, 2025, Source 1 received a text message from Contractor, which stated, "[Source 1] my name is [Contractor]. We have a mutual friend in **[KEVIN DION HOLLINSHEAD]** and he suggested I connect with you on an issue we

are having with CCSD. Would you have time to talk with me sometime today on this matter?"

18.     On or about May 9, 2025, Source 1, Contractor, and **KEVIN DION HOLLINSHEAD** met at Construction Company's offices in North Charleston, South Carolina. During the meeting, Contractor told Source 1 that the bid was rejected on a technicality and that Construction Company wanted CCSD to review the bid and ultimately award it to Construction Company as the low-cost bidder.

19.     During the meeting, **KEVIN DION HOLLINSHEAD** told Source 1 and Contractor that he could not sit on a review panel because of his prior relationship with Contractor and Construction Company. However, **KEVIN DION HOLLINSHEAD** offered to help influence the selection process for the Review Panel by designating people who would be sympathetic to Construction Company's position. **KEVIN DION HOLLINSHEAD** further stated that if Construction Company were to hire Source 1 as a consultant, it would be viewed favorably during the process.

20.     Source 1 stated that he charges an hourly rate or a flat $5,000 fee per month as a consultant, and that if hired, he and **KEVIN DION HOLLINSHEAD** would continue to work together to advance Construction Company's bid protest. Contractor responded, "[W]hat you guys are doing to facilitate that behind the scenes is really your . . . business."

21.     During the meeting, **KEVIN DION HOLLINSHEAD** mentioned a trailer he needed to purchase for his catering business. After the meeting, Source 1 told **KEVIN DION HOLLINSHEAD** that he would help him get the trailer. Source 1 then confirms that **KEVIN DION HOLLINSHEAD** was good with twenty percent.

22.     Immediately following the meeting on May 9, 2025, Source 1 and **KEVIN DION HOLLINSHEAD** discussed moving forward with Source 1's assistance. Source 1 offered to pay **KEVIN DION HOLLINSHEAD** a twenty percent kickback from his consulting fee from Construction Company because **KEVIN DION HOLLINSHEAD** had facilitated the arrangement and agreed to assist their efforts.

23.     On or about May 9, 2025, Contractor sent an email to Source 1 about the terms of Source 1's consulting agreement. Contractor stated that Construction Company did not have a standard consulting agreement and counseled against establishing Source 1 as a vendor. Instead, Contractor proposed that:

> [Source 1] is happy to present this proposal to provide advice and support with navigating the procurement process of Charleston County School District, specifically with the goal of obtaining a favorable decision on the pending protested award for the District 10 replacement school. We propose a lump sum agreement beginning the date of this agreement of $5,000 per month.

24.     Source 1 and **KEVIN DION HOLLINSHEAD** then communicated via telephone about Contractor's offer. **KEVIN DION HOLLINSHEAD** stated that he would work to persuade other members of CCSD's Board of Trustees to appoint members to the Review Panel who would be sympathetic to Construction Company's bid protest.

### *Source 1 Agrees to Work on Behalf of Construction Company*

25.     On or about May 12, 2025, Source 1 responded to Contractor's email about the proposed consulting agreement and accepted the contract for a flat fee of $5,000 per month.

26.     Throughout May 2025 and June 2025, Source 1 and **KEVIN DION HOLLINSHEAD** discussed **KEVIN DION HOLLINSHEAD's** efforts to facilitate a favorable Review Panel. When Source 1 stated that he had not yet been paid by Construction Company, **KEVIN DION HOLLINSHEAD** offered to contact Contractor regarding the status of payment.

27.     **KEVIN DION HOLLINSHEAD** told Source 1 that Construction Company had offered to settle the dispute for a sum equal to its costs associated with submitting a bid, or $185,000. When Source 1 asked if CCSD's Board of Trustees would vote on whether to accept the settlement offer, **KEVIN DION HOLLINSHEAD** responded, "I hope it do. If it do, I am going to vote yes because it no conflict for me. I am voting. I am going to encourage that shit." **KEVIN DION HOLLINSHEAD** further stated, "I just can't sit on the panel but I damn sure say, hey, settle that shit."

28.     On June 11, 2025, **KEVIN DION HOLLINSHEAD**, Source 1, and Contractor met at Construction Company to discuss the protest process and a potential settlement. At the beginning of the meeting, **KEVIN DION HOLLINSHEAD** stated: "What we talk about stays in this room, other than them. I was never here."

29.     On or about June 24, 2025, **KEVIN DION HOLLINSHEAD** texted Contractor and told him that Source 1 had not received his check. Thereafter, Contractor told **KEVIN DION HOLLINSHEAD** that the check went out a few days prior and that Source 1 should receive it soon. On or about June 26, 2025, **KEVIN DION HOLLINSHEAD** texted Source 1 asking if he had received a check from Construction

Company for consulting work. **KEVIN DION HOLLINSHEAD** stated that Contractor told him that the check had been requested.

*Source 1 Pays a Kickback to Kevin Dion Hollinshead*

30.     On or about June 27, 2025, Source 1 received a $5,000 check from Construction Company. Source 1 then sent a text message to **KEVIN DION HOLLINSHEAD** on or about June 28, 2025, advising him that the check had been received. Source 1 then asked **KEVIN DION HOLLINSHEAD** about the cost of a trailer that **KEVIN DION HOLLINSHEAD** was intending to purchase, to which **KEVIN DION HOLLINSHEAD** responded, "1040."

31.     On or about July 2, 2025, Source 1 met with **KEVIN DION HOLLINSHEAD** in North Charleston, South Carolina. **KEVIN DION HOLLINSHEAD** told Source 1 that Construction Company's settlement offer included $10,000 that would be earmarked for Source 1. During the meeting, Source 1 provided **KEVIN DION HOLLINSHEAD** with $1,040 in cash.

*Kevin Dion Hollinshead's Attempts to Influence the Protest Process*

32.     Beginning in at least February 2025 and continuing through July 2025, **KEVIN DION HOLLINSHEAD** attempted to influence other Trustees and CCSD employees regarding Construction Company's protest. **KEVIN DION HOLLINSHEAD** advocated for Construction Company's position, including by:

    a. Contacting CCSD employees in an attempt to reverse the decision to award the contract to another construction company;

    b. Expressing concerns about the procurement process;

c. Recommending and encouraging the selection of certain individuals to serve on the Review Panel; and

d. Advocating for CCSD to settle with Construction Company.

### *Kevin Dion Hollinshead Continues to Influence Procurement Process on Behalf of Construction Company*

33. On June 16, 2025, Contractor sent **KEVIN DION HOLLINSHEAD** an email with a proposed draft of a letter to the Superintendent and the School Board.

34. On or about July 11, 2025, Source 1 and **KEVIN DION HOLLINSHEAD** spoke with Source 1 by telephone about Construction Company's protest. During the call, **KEVIN DION HOLLINSHEAD** revealed that although he was not permitted to participate in a CCSD Board of Trustees executive session about the bid protest, a fellow Board of Trustees member advised **KEVIN DION HOLLINSHEAD** that CCSD intended to offer $15,000 to settle the dispute.

35. On June 16, 2025, Contractor sent **KEVIN DION HOLLINSHEAD** an email with a proposed draft of a letter to the Superintendent and the School Board, addressing Construction Company's issues with the procurement process. **KEVIN DION HOLLINSHEAD** revised Contractor's proposed draft letter and put the revised letter on his letterhead. **KEVIN DION HOLLINSHEAD** sent the revised letter, dated August 1, 2025, to CCSD's Superintendent and the Board of Trustees, which stated that it was "From the desk of Kevin Hollinshead, Charleston County School District, District 4 Trustee." The letter further stated, in pertinent part, that he had written the letter in his official capacity

as a member of CCSD's Board of Trustees and that the letter was intended to express concern about the circumstances surrounding Construction Company's bid protest.

36.     **KEVIN DION HOLLINSHEAD** first expressed concern about his exclusion from the process and CCSD's handling of the procurement process in general. **KEVIN DION HOLLINSHEAD** then specifically outlined concerns with Construction Company's bid for the District 10 middle school, requested records related to the bid, and requested an independent review of CCSD's procurement process.

37.     On or about August 27, 2025, the Review Panel met to discuss Construction Company's appeal and then issued a decision in favor of CCSD, thus rejecting Construction Company's appeal.

## COUNT 1
### Bribery with Respect to Programs Receiving Federal Funds, Title 18 U.S.C. Sections 666(a)(1)(B) and (b) and 2

**THE GRAND JURY FURTHER CHARGES:**

38.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 37 of this Indictment as if fully set forth herein:

39.     Beginning in or about February 2025 and continuing until in or about August 2025, in the District of South Carolina and elsewhere, the Defendant, **KEVIN DION HOLLINSHEAD**, being an agent and representative of the Charleston County School Board of Trustees and CCSD, a local government agency that received benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, and other forms of Federal assistance in a one year period, together with and aided and abetted by others known and unknown to the Grand Jury, did corruptly solicit, demand, and knowingly

accept and agree to accept, for his own benefit, a thing of value from Source 1, intending to be influenced and rewarded in connection with a business, transaction and series of transactions involving $5,000 or more, that is, the construction of a new school in CCSD District 10 and Construction Company's protest of the procurement process;

All in violation of Title 18, United States Code, Sections 666(a)(1)(B) and (b) and 2.

## COUNT 2
### Honest Services Wire Fraud, 18 U.S.C. Sections 1343, 1346 and 2

**THE GRAND JURY FURTHER CHARGES:**

40.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 37 of this Indictment as if fully set forth herein:

41.    As set forth above, beginning in or around February 2025 and continuing until in or around August 2025, in the District of South Carolina and elsewhere, the Defendant **KEVIN DION HOLLINSHEAD** and others known and unknown to the Grand Jury, knowingly devised and intended to devise a scheme and artifice to defraud and deprive the citizens of Charleston County, South Carolina, the Charleston County School District, and the Board of Trustees of their intangible right to the honest services of a public office, namely the honest services of **KEVIN DION HOLLINSHEAD**, through bribery and kickbacks.

42.    On or about June 27, 2025, in the District of South Carolina and elsewhere, the Defendant **KEVIN DION HOLLINSHEAD**, aided and abetted by others both known and unknown to the Grand Jury, having devised the above-described scheme and artifice

to defraud and deprive by means of materially false and fraudulent pretenses, representations, and promises, and the omission of material information, and for the purpose of executing the above-described scheme and artifice to defraud and deprive, transmitted and caused to be transmitted by means of wire communication in interstate commerce, any writings, signs, signals, pictures, and sounds, that is, a $5,000 check to Source 1 from Construction Company;

All in violation of Title 18, United States Codes, Sections 1343, 1346, and 2.

### Background on PPP Fraud Scheme as Charged in Counts 3, 4, and 5

#### *The CARES Act*

43.     The United States Small Business Administration ("SBA") is an executive branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA is to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters. As part of this effort, the SBA enables and provides for loans through banks, credit unions, and other lenders. These loans have government-backed guarantees.

44.     In March 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) to help businesses impacted by COVID-19 to continue paying their employees.

#### *PPP Loan*

45.     One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other

expenses through a program referred to as the Paycheck Protection Program ("PPP"). In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

46.     The PPP program provided forgivable loans to small businesses for job retention and certain other expenses. The PPP permitted participating third-party lenders to approve and disburse SBA-backed PPP loans to cover payroll, fixed debts, utilities, rent/mortgage, accounts payable and other bills incurred by qualifying businesses during, and resulting from, the COVID-19 pandemic. PPP loans were fully guaranteed by the SBA.

47.     To obtain a PPP loan, a qualifying business had to submit a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications to be eligible to obtain the PPP loan, including that the business was in operation and either had employees for whom it paid salaries and payroll taxes or paid independent contractors. A business applying for a PPP loan was required to provide documentation showing its payroll expenses, such as filed federal income tax documents.

48.     PPP loan applications were electronically submitted or caused to be submitted by the borrower and received through SBA servers located in Virginia and/or Oregon. Once approved, the business received the PPP loan proceeds via an electronic funds transfer from the third-party lender to a financial account under the control of the business, or via a check to the business.

49.     The proceeds of a PPP loan could be used for certain specified items, such as payroll costs, costs related to the continuation of group health care benefits, or mortgage

interest payments. The proceeds of a PPP loan were not permitted to be used by the borrowers to purchase consumer goods, automobiles, personal residences, clothing, jewelry, to pay the borrower's personal federal income taxes, or to fund the borrower's ordinary day-to-day living expenses unrelated to the specified authorized expenses.

50.     Optus Bank is a federally insured financial institution. Optus Bank was a third-party approved participating lender in the PPP program and, as such, was authorized to lend funds to eligible borrowers under the terms of the PPP.

### *The Scheme to Defraud*

51.     From in or about April 2020 to the present, in the District of South Carolina and elsewhere, the Defendant, **KEVIN DION HOLLINSHEAD**:

a. knowingly devised a scheme and artifice to defraud the Small Business Administration and Optus Bank, and to obtain money and property in the possession of Optus Bank, by means of false and fraudulent pretenses, representations, and promises, and to transmit and cause to be transmitted, by means of wire, radio, or television communication in interstate commerce, writings, signals, pictures or sounds for the purpose of executing the scheme and artifice to defraud, in violation of Title 18, United States Code, Section 1343; and

b. knowingly execute and attempt to execute a scheme and artifice to defraud Optus Bank and to obtain the moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of Optus Bank, a financial institution insured by the FDIC, by means of materially false and

fraudulent pretenses, representations and promises and failing to disclose material information and fraudulently concealing material information, in violation of Title 18, United States Code, Sections 1344(1) and 1344(2).

*Manner and Means of the Scheme to Defraud*

52.    The manner and means by which **KEVIN DION HOLLINSHEAD** sought to accomplish the scheme to defraud include, but is not limited to, the following:

53.    On or about April 28, 2020, **KEVIN DION HOLLINSHEAD** electronically submitted an application for a PPP loan to Optus Bank, a lender approved by the SBA to issue PPP loans. **KEVIN DION HOLLINSHEAD** submitted the loan on behalf of "Bridgeport Management Development And Consultant, d/b/a Bridgeport Management." In the loan application, **KEVIN DION HOLLINSHEAD** declared that he owned 51% of the business.

54.    On or about June 27, 2020, **KEVIN DION HOLLINSHEAD** completed and submitted SBA Form 2483, the PPP borrower application, to support the Optus Bank PPP loan application he submitted on or about April 28, 2020. In the SBA Form 2483, **KEVIN DION HOLLINSHEAD** submitted the Form on behalf of "Bridgeport Services LLC d/b/a Bridgeport Management and Development."[1] **KEVIN DION HOLLINSHEAD** further declared that he owned 100% of the business.

---

[1] "Bridgeport Management Development and Consultant, d/b/a Bridgeport Management" and "Bridgeport Services LLC d/b/a Bridgeport Management and Development" will be referred to interchangeably as Bridgeport.

55.     In the application, **KEVIN DION HOLLINSHEAD** certified that the funds would be used for business-related purposes, consistent with the Paycheck Protection Program Rule. **KEVIN DION HOLLINSHEAD** further indicated that he understood that if the funds were knowingly used for unauthorized purposes, the federal government may hold him legally liable, including charges for fraud. **KEVIN DION HOLLINSHEAD** also certified that the tax documents provided to Optus Bank were identical to the tax documents submitted to the Internal Revenue Service.

56.     **KEVIN DION HOLLINSHEAD** made numerous materially false and fraudulent representations and falsified documents as part of the application submissions to Optus Bank and the SBA. Specifically, **KEVIN DION HOLLINSHEAD** attached a falsified Schedule C and misrepresented the number of employees and the corresponding average monthly payroll expenses.

57.     On or about June 30, 2020, **KEVIN DION HOLLINSHEAD** opened a bank account ending in 4462 at Optus Bank in the name of Bridgeport Services LLC. **KEVIN DION HOLLINSHEAD** was the only authorized signer on the account.

58.     Based on the loan application, the SBA and Optus Bank granted the PPP loan. On or about July 1, 2020, **KEVIN DION HOLLINSHEAD** received a $24,200 incoming transfer from the SBA PPP loan, wired into his Optus account ending in 4462.

59.     Thereafter, **KEVIN DION HOLLINSHEAD** spent the funds on non-qualifying, non-business-related purposes, in violation of the PPP loan program, including, but not limited to, payment of personal insurance premiums, personal expenditures, $6,050

to Bariatric Medical Solutions LLC for a medical procedure in Tijuana, Mexico, and travel expenses to and from Tijuana, Mexico related to the medical procedure.

60.     On April 27, 2021, **KEVIN DION HOLLINSHEAD** submitted a request for a Second Draw on the Optus Bank PPP loan, on behalf of "Bridgeport Services LLC." In the application, **KEVIN DION HOLLINSHEAD** certified that all loan proceeds would be used for business-related purposes, consistent with the Paycheck Protection Program Rules.

61.     **KEVIN DION HOLLINSHEAD** submitted falsified tax documents to support his request for a Second Draw PPP loan, including two falsified Schedule C forms for 2019 and 2020. The 2019 Schedule C attached to the Second Draw PPP loan application was inconsistent with the 2019 Schedule C attached to the initial loan application submitted in 2020.

62.     Additionally, in the Second Draw PPP loan application, **KEVIN DION HOLLINSHEAD** made material misrepresentations and omissions.

63.     On April 28, 2021, Optus Bank funded the Second Draw PPP loan, totaling $20,765.00.

64.     Thereafter, **KEVIN DION HOLLINSHEAD** spent some of the funds on non-qualifying, non-business-related purposes, in violation of the PPP loan program, including, but not limited to, personal transfers and expenses, restaurants, grocery stores, medical bills, living expenses, car payments, and insurance payments.

## COUNT 3
### Bank Fraud, Title 18, United States Code, § 1344

**THE GRAND JURY FURTHER CHARGES THAT:**

65.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 and 43 through 64 of this Indictment as if fully set forth herein:

66.     On or about April 28, 2020 and continuing until at least April 28, 2021, in the District of South Carolina, and elsewhere, the Defendant **KEVIN DION HOLLINSHEAD**, knowingly executed a scheme to defraud Optus Bank and to obtain money owned by and under the custody and control of Optus Bank, a financial institution whose accounts are insured by the Federal Deposit Insurance Corporation, by means of materially false and fraudulent pretenses, representations, and promises, that is: **KEVIN DION HOLLINSHEAD** submitted PPP loan applications, on behalf of Bridgeport, containing material misrepresentations and falsified documents, including false representations regarding the number of employees, inaccurate monthly payroll expenses, and falsified supporting documentation, including a falsified Schedule C, and thereafter used the funds for unauthorized expenses for his own personal enrichment;

All in violation of Title 18, United States Code, Section 1344.

## COUNT 4
### Wire Fraud, Title 18, United States Code, § 1343

67.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 and 43 through 64 of this Indictment as if fully set forth herein:

68.    On or about July 1, 2020, the Defendant **KEVIN DION HOLLINSHEAD**, for the purpose of executing the scheme and artifice described above, did transmit and cause to be transmitted in interstate commerce, by means of wire communications, writings, signs, and signals, that is: **KEVIN DION HOLLINSHEAD** caused Optus Bank to issue a wire in the amount of $24,200.00, representing PPP loan funds, to an account ending in 4462, controlled by **KEVIN DION HOLLINSHEAD**;

All in violation of Title 18, United States Code, Section 1343.

## COUNT 5
### Wire Fraud, Title 18, United States Code, § 1343

69.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 and 43 through 64 of this Indictment as if fully set forth herein:

70.    On or about April 20, 2021, the Defendant **KEVIN DION HOLLINSHEAD**, for the purpose of executing the scheme and artifice described above, did transmit and cause to be transmitted in interstate commerce, by means of wire communications, writings, signs, and signals, that is: **KEVIN DION HOLLINSHEAD** caused Optus Bank to issue a check in the amount of $20,765.00, representing PPP loan funds, to Bridgeport Services, LLC, and thereafter deposited the check into a Wells Fargo account ending in 8515, controlled by **KEVIN DION HOLLINSHEAD**;

All in violation of Title 18, United States Code, Section 1343.

# **FORFEITURE**

BRIBERY/FRAUD:

Upon conviction for violation of Title 18, United States Code 666, 1343, 1344, and 1346 as charged in this Indictment, the Defendant, **KEVIN DION HOLLINSHEAD**, shall forfeit to the United States any property, real or personal, constituting, derived from or traceable to proceeds the Defendant obtained, directly or indirectly, as a result of such offenses.

PROPERTY:

Pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(2), and 28 U.S.C. § 2461(c), the property which is subject to forfeiture for the violations charged in this Indictment includes, but is not limited to, the following:

Cash Proceeds / Forfeiture Judgment:

A sum of money equal to all proceeds the Defendant obtained, directly or indirectly, from the offenses charged in this Indictment, and all interest and proceeds traceable thereto, and/or such sum that equals all property derived from or traceable to his violation of 18 U.S.C. §§ 666, 1343, and 1344.

SUBSTITUTE ASSETS:

If any of the property described above as being subject to forfeiture to the United States, as a result of any act or omission of the Defendant,

    (1)    Cannot be located upon the exercise of due diligence;
    (2)    Has been transferred or sold to, or deposited with a third party;
    (3)    Has been placed beyond the jurisdiction of the Court;
    (4)    Has been substantially diminished in value; or
    (5)    Has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b)(1), [incorporating Title 21, United States Code, Section 853(p)], to seek forfeiture of any other property of the said Defendant up to the value of the above forfeitable property.

Pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(2) and 982(a)(3), and Title 28, United States Code, Section 2461(c).

A _____ true _____ BILL



FOREPERSON

BRYAN P. STIRLING
UNITED STATES ATTORNEY

By: _____

Emily Evans Limehouse (Fed. ID #12300)
Whit Sowards (Fed. ID # 11844)
Assistant United States Attorneys
151 Meeting Street, Suite 200
Charleston, SC 29401
Tel.:      (843) 727-4381
Fax:      (843) 727-4443
Email:   Emily.Limehouse@usdoj.gov